**UNITED STATES, Appellee,**

v.

**Peter A. NEDD, Defendant, Appellant.**

**No. 00–2569.**

United States Court of Appeals, First Circuit.

Heard May 11, 2001.
Decided Sept. 4, 2001.

Owen S. Walker, Federal Public Defender, for appellant.

John T. McNeil, Assistant U.S. Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.

Before TORRUELLA, Circuit Judge, CAMPBELL and BOWNES, Senior Circuit Judges.

LEVIN H. CAMPBELL, Senior Circuit Judge.

Peter Nedd appeals from his sentence of thirty-three months imprisonment imposed after pleading nolo contendere to four counts of transmitting threatening communications in interstate commerce in violation of 18 U.S.C. § 875(c) and pleading guilty to one count of interstate violation of a restraining order in violation of 18 U.S.C. § 2262(a)(1). He argues that the district court erred in its application of the grouping rules of the United States Sentencing Guidelines, in particular, U.S.S.G. § 3D1.2 ("Groups of Closely Related Counts"), by grouping the five-count indictment into three groups instead of into one group.[1] We affirm, although on an interpretation of the grouping rules different from that of the district court.

## I. BACKGROUND

The facts underlying this appeal are not in dispute. We take the facts and sentenc-

---

1. Originally, the indictment against Peter Nedd issued with six counts, four counts of interstate threats (Counts I–IV), one count of interstate stalking (Count V), and one count of interstate violation of a restraining order (Count VI). The government dismissed Count V at sentencing.

ing details from the Presentence Report (PSR) and the transcript of proceedings below. *United States v. Lindia*, 82 F.3d 1154, 1158 (1st Cir.1996).

## A. Defendant's Personal History

Defendant Peter Nedd is a thirty-eight year old man with a history of mental illness such as manic depression and schizophrenia, both of which were diagnosed in 1989 when he was living in Boston and hospitalized for a brief time.

While a resident of Boston, Nedd attended the Kingdom Hall of Jehovah Witnesses in Cambridge. There he met the Carpenter family, Richard and Andrea Carpenter and their daughter Chantelle. Nedd became obsessed with Chantelle, desiring her romantic affection. Nedd would call the Carpenters' house repeatedly requesting to see Chantelle and would send Chantelle gifts. His attention was unreciprocated. Richard Carpenter became especially concerned with Nedd's behavior when, in 1996, Nedd falsely claimed that Richard Carpenter had given Chantelle permission to marry Nedd. At the time, Chantelle was a teenager and Nedd in his early thirties.

Although Nedd moved to New York in 1996, his obsession with Chantelle did not end. He continued to call the Carpenters' home and to send letters and gifts to Chantelle. The Carpenters felt harassed by Nedd's repeated communications. They stopped answering their phone and began to record all of his telephone messages with their answering machine.

The Carpenters describe Nedd's messages left on the their answering machine in the fall of 1998 as changing in tone from romantic obsession to threatening violence. Those messages demanded that Richard

Carpenter allow Chantelle to marry Nedd or that Chantelle return all the gifts Nedd had sent her. The Carpenters did not return Nedd's calls.

In May 1999, Nedd came from New York to Boston to see Chantelle. When Richard and Andrea Carpenter learned that Nedd was in Boston, they sent Chantelle into hiding and obtained a temporary restraining order against Nedd. That restraining order was made permanent on June 3, 1999 and prohibits Nedd from, among other things, threatening either Richard or Chantelle Carpenter.

## B. Criminal Conduct for the Instant Case

Although Nedd returned to New York without further calls or attempted visits to the Carpenters' home, during the summer of 1999, he persisted in harassing the Carpenters as before.[2] Then, on October 14, 1999, Nedd called the Carpenters from New York and left what would be the first of four recorded violent messages on their home telephone answering machine that form the bulk of the present charges. On that day he left the following message on the Carpenters' answering machine: "Hey Richard Carpenter, did you get that letter I sent your fucking daughter, ... if I see you and you come near me I will break your fucking jaw. If you have a fucking gun, I will shove that shit up your fucking hole and blow your fucking brains out...." This conduct forms Count I of the indictment issued against Nedd in this case ("Interstate Threats" in violation of 18 U.S.C. § 875(c)).

On October 18, 1999, Nedd again called the Carpenters, this time saying that he was on his way to Boston. After arriving in Boston, he made several calls to the

---

2. The Carpenters filed a complaint for contempt of the restraining order in Massachusetts, but Nedd never appeared for the contempt hearing.

Carpenters and tried to visit them at their home, to no avail. This behavior violated the permanent restraining order and is the conduct that forms Count VI of the indictment ("Interstate Violation of a Restraining Order" in violation of 18 U.S.C. § 2262(a)(1)).

On November 30, 1999, Nedd left another message from New York on the Carpenters' answering machine that said, in relevant part: "Hey Richard, if I don't get my fucking shit back that I gave your daughter ... with a fucking note that says I am sorry I hurt your feelings ..., I will fucking kill you, and her, and your fucking wife [slams the phone down]." This conduct forms Count II of the indictment ("Interstate Threats," 18 U.S.C. § 875(c)).

On December 4, 1999, Nedd left the following message that forms Count III of the indictment ("Interstate Threats," 18 U.S.C. § 875(c)): "Hey Richard Carpenter, guess what? ... I'm going to kill you and I am going to beat the shit out of you and if I see your fucking daughter I'll beat the shit out of her and fuck her up the ass like a fucking dog. . . ."

On December 6, 1999, Nedd left the last of the four messages described in the indictment. This one forms Count IV ("Interstate Threats," 18 U.S.C. § 875(c)). It said: "Hey Richard Carpenter ... I'm going to fucking kill you ... I'm coming to Boston, Richard, and this time you won't see me. And when you come to your fucking house I will break your fucking head open. I'll kill your wife and your fucking daughter if you do not send all my personal things back. . . ."

## C. Charges and Plea

On April 26, 2000, Nedd was charged with four counts of interstate threats in violation of 18 U.S.C. § 875(c) (Counts I–IV) and one count of interstate violation of a restraining order in violation of 18

U.S.C. § 2262(a)(1)(Count VI). On July 13, 2000, the district court accepted Nedd's plea of nolo contendere to Counts I–IV and accepted Nedd's plea of guilty to Count VI. The charges to which he pleaded read as follows:

*COUNT ONE*: 18 U.S.C. § 875(c)—Interstate Threats

. . .

On or about October 14, 1999, at Boston, in the District of Massachusetts,

### PETER A. NEDD

defendant herein, knowingly and willfully transmitted in interstate commerce a communication containing a threat to injure the person of another, to wit: a telephone call originating outside the Commonwealth of Massachusetts placed to a telephone in Boston, Massachusetts which threatened to break the jaw and to blow the brains out of Richard Carpenter.

All in violation of Title 18, United States Code, Section 875(c).

*COUNT TWO*: 18 U.S.C. § 875(c)—Interstate Threats

. . .

On or about November 30, 1999, at Boston, in the District of Massachusetts,

### PETER A. NEDD

defendant herein, knowingly and willfully transmitted in interstate commerce a communication containing a threat to injure the person of another, to wit: a telephone call originating outside the Commonwealth of Massachusetts placed to a telephone in Boston, Massachusetts which threatened to kill Richard Carpenter, Andrea Carpenter, and Chantelle Carpenter.

All in violation of Title 18, United States Code, Section 875(c).

*COUNT THREE* : 18 U.S.C. § 875(c)—
Interstate Threats

. . .

On or about December 4, 1999, at Boston, in the District of Massachusetts,

### PETER A. NEDD

defendant herein, knowingly and willfully transmitted in interstate commerce a communication containing a threat to injure the person of another, to wit: a telephone call originating outside the Commonwealth of Massachusetts placed to a telephone in Boston, Massachusetts which threatened to kill Richard Carpenter, and to beat and to forcibly sodomize Chantelle Carpenter.

All in violation of Title 18, United States Code, Section 875(c).

*COUNT FOUR:* 18 U.S.C. § 875(c)—
Interstate Threats

. . .

On or about December 6, 1999, at Boston, in the District of Massachusetts,

### PETER A. NEDD

defendant herein, knowingly and willfully transmitted in interstate commerce a communication containing a threat to injure the person of another, to wit: a telephone call originating in New York State placed to a telephone in Boston, Massachusetts which threatened to kill Richard Carpenter, Andrea Carpenter, and Chantelle Carpenter.

All in violation of Title 18, United States Code, Section 875(c).

. . .

*COUNT SIX:* 18 U.S.C. § 2262(a)(1)—
Interstate Violation of a Protective Order

. . .

On or about October 18, 1999, at Boston, in the District of Massachusetts,

### PETER A. NEDD

defendant herein, traveled across the State line of the Commonwealth of Massachusetts with the intent to engage in conduct that violated that portion of the protection order issued by the Commonwealth of Massachusetts Superior Court that involved protection of Richard Carpenter and Chantelle Carpenter against repeated harassment, and the defendant subsequently engaged in repeated harassment in violation of that protective order by repeatedly telephoning the residence of Richard and Chantelle Carpenter on or about October 18 and 19, 1999, and by attempting to visit them at their residence on or about October 18, 1999.

All in violation of Title 18, United States Code, Section 2262(a)(1).

On November 29, 2000, the district court sentenced Nedd to thirty-three months incarceration and three years of supervised release, imposing a number of special conditions including that the defendant continue to take his anti-psychotic medication and that he have no contact with the Carpenters.

### D. The Sentencing Determination Made Below

At the sentencing hearing in the district court, the court discussed with the parties the most appropriate method under the Sentencing Guidelines for grouping the five counts of the indictment. *See generally* U.S.S.G., Ch. 3, Pt. D, introductory cmt. (entitled "Multiple Counts", one purpose of which is to "determin[e] a single offense level that encompasses all the counts of which the defendant is convicted"). Probation recommended grouping the five counts according to victim, positing three groups, one for each of the three members

of the Carpenter family.[3] The government advocated probation's position with proffers of victim impact statements from each of the Carpenters. Nedd's counsel objected to this method, arguing that grouping by victim was not permitted under the Sentencing Guidelines as such a method split a count among several groups, putting one count into more than one group, *see supra* note 3, and therefore had the potential to create more groups than counts and would thwart the purposes of grouping, which is to lessen the amount of sentencing determinations and to "prevent multiple punishment for substantially identical offense conduct." *Id.* It was and remains the defendant's position that all five counts should form one group. According to the defendant, all five counts involve substantially the same harm within the meaning of U.S.S.G. § 3D1.2 (stating that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group"). This would result in a sentence of eighteen to twenty-four months, as opposed to the twenty-seven to thirty-three month range for the three victim-defined groups advocated by the government.

The district court sentenced Nedd to thirty-three months in prison, the high-end of the government's proposed guideline range. In so doing, the district court settled on three groups for the five counts of the indictment, accepting probation's and the government's position that grouping the counts of the indictment into three groups by victim, each a member of the Carpenter family, was the correct application of the Sentencing Guidelines. Nedd

has appealed from this sentencing determination.

## II. DISCUSSION

This appeal presents two related questions. First, whether the district court erred when it refused defendant's request to group all five counts of the indictment as one group under U.S.S.G. § 3D1.2 ("Groups of Closely Related Counts"). Second, if grouping more than one group was appropriate, whether the district court erred when it split the counts of the indictment between three groups, each corresponding to a primary victim, either Richard, Andrea or Chantelle Carpenter.

### A. The Grouping Rules

We look first at the language and purpose of the grouping rules in the Sentencing Guidelines. The Introductory Commentary to the chapter at issue, U.S.S.G., Ch. 3, Pt. D ("Multiple Counts"), indicates that the grouping rules are meant to serve at least two main objectives. One such objective is to bundle multi-count indictments into sets of counts that share the same harm or can be otherwise characterized as the same type of wrongful conduct in order "to provide incremental punishment for significant additional criminal conduct." U.S.S.G. Ch. 3, Pt. D, introductory cmt. "Some offenses that may be charged in multiple-count indictments are so closely intertwined with other offenses that conviction for them ordinarily would not warrant increasing the guideline range." *Id.* For example, "[e]mbezzling money from a bank and falsifying the related records, although legally distinct of-

---

**3.** Such a grouping method would look like this:

Group One: For Richard Carpenter, includes Counts I, II, III, IV and VI;

Group Two: For Andrea Carpenter, includes Counts II and IV;

Group Three: For Chantelle Carpenter, includes Counts II, III, IV and VI.

This would put Counts II and IV, for example, in all three groups and Counts III and VI in two groups.

fenses, represent essentially the same type of wrongful conduct with the same ultimate harm, so that it would be more appropriate to treat them as a single offense for purposes of sentencing."[4] *Id.*

Another objective of the guidelines' grouping rules is to limit the effect of prosecutorial choices in the design of the indictment which, by charging multiple offenses intend to exact (or threaten) greater punishment but which, nevertheless, may be fairly characterized with fewer counts and thus punishable by a less severe sentence.

> In order to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct, this Part provides rules for grouping offenses together. Convictions on multiple counts do not result in a sentence enhancement unless they represent additional conduct that is not otherwise accounted for by the guidelines. In essence, counts that are grouped together are treated as constituting a single offense for purposes of the guidelines.

*Id.*

The rules that instruct a district court how to group "closely related counts" reflect the above-stated goals. Those rules state in relevant part:

> All counts involving substantially the same harm shall be grouped into a single Group. Counts involve substantially the same harm within this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

U.S.S.G. § 3D1.2.

In addition to the above rules, the district court cited to the Application Notes to the guidelines § 2A6.1 and § 2A6.2 that correspond to the offenses of conviction, 18 U.S.C. § 875(c) and 18 U.S.C. § 2262(a)(1) respectively. Those notes say that "[f]or purposes of Chapter Three, Part D (Multiple Counts), multiple counts involving . . . threatening or harassing . . . the same victim are grouped together under § 3D1.2 (Groups of Closely Related Counts). *Multiple counts involving different victims are not to be grouped under § 3D1.2.*" U.S.S.G. § 2A6.1, cmt. n. 2 (emphasis added).[5] From this directive, and in light of

---

**4.** Another example illustrates the further point that some offenses may be grouped based not only on the interlocking relationship of the two offenses but on the enhancement factors triggered by the sentencing guideline for the more serious of the offenses in the indictment. "Other offenses, such as an assault causing bodily injury to a teller during a bank robbery, are so closely related

to the more serious offense [bank robbery] that it would be appropriate to treat them as part of the more serious offense, leaving the sentence enhancement to result from application of a specific offense characteristic [assault]." *Id.*

**5.** Section 2A6.2 of the U.S.S.G. is essentially the same. *See* § 2A6.2, cmt. n. 4.

U.S.S.G. § 3D1.2, the district court determined that counts with distinct victims despite describing the same crime could not be grouped together. Neither party quarrels with that generalization. Indeed, the plain language of the guideline commentary quoted above leaves scarce room for any other interpretation.[6]

## B. First Question Presented

Based upon the premise that counts with the same victim may be grouped and those with different victims may not be grouped, the defendant urged the district court to group all five counts into one group because all five counts shared the same primary victim (Richard Carpenter) and a common criminal objective (to harass Richard Carpenter's family). Nedd contends that Andrea and Chantelle Carpenter were mere secondary or indirect victims of his threatening behavior. *See* U.S.S.G. § 3D1.2, cmt. n. 2 ("The term 'victim' is not intended to include indirect or secondary victims. Generally there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim."). If this were so here—and defendant argues it was by virtue of the fact that all four of his phone calls began "Hey Richard"—§ 3D1.2(b) might be invoked to form just a single group from all five counts, thereby resulting in a lower guideline sentencing range.

The district court rejected this contention finding that "[t]he plain reading of . . . the communication [the four threats], suggests there were three primary victims, there were threats directly to three different people." The district court therefore refused to find that Richard Carpenter was the sole primary victim, and that Chantelle and her mother Andrea were not also primary victims, of Nedd's threatening conduct. Finding three primary victims, the court determined that it could not group all five counts as one.

■ The district court based its factual finding that all three victims were "primary" on the language of the indictment, the tape recordings of the threats, and the written victim impact statements submitted by each of the three Carpenters. These sources attested to the independent, personal, and deeply traumatic effects of Nedd's harassing, threatening and stalking behavior upon each member of the Carpenter family. We can find no error in the district court's assessment to this effect, let alone clear error. We accept the district court's ruling that there were three primary victims across all five counts. *See United States v. Freeman*, 176 F.3d 575, 578 (1st Cir.1999) (reviewing a district

---

**6.** The background commentary to the grouping rules supports this conclusion. That note says, in relevant part:

A primary consideration in this section is whether the offenses involve different victims. For example, a defendant may stab three prison guards in a single escape attempt. Some would argue that all counts arising out of a single transaction or occurrence should be grouped together even when there are distinct victims. Although such a proposal was considered, it was rejected because it probably would require departure in many cases in order to capture adequately the criminal behavior. Cases involving injury to distinct victims are suffi-

ciently comparable, whether or not the injuries are inflicted in distinct transactions, so that each such count should be treated separately rather than grouped together. U.S.S.G. § 3D1.2, cmt. background. An implication to be drawn from this commentary is that distinct victims to a single crime when named in separate counts (*i.e.* Counts I, II, and III naming Victims A, B and C respectively as victims of assault during a single bank robbery) shall not be bundled together just because they were all injured at the same time for the same reason. This, in addition to the argument that follows, *infra*, undermines defendant's contention that all five counts should be bundled together in one group.

court's factual determinations at sentencing for clear error). Defendant's argument—that each threat begins with "Hey Richard"—does not obviate the fact that each threat, except the first, names another Carpenter and holds out the prospect of terrifying violence against her. It follows, then, that the court did not err in denying defendant's request to form one group from the five counts based on a common primary victim where some counts, although not all, contained additional primary victims. *See* U.S.S.G. § 2A6.1, cmt. n. 2 ("Multiple counts involving different victims are not to be grouped. . . .").

## C. Second Question Presented

■ A second question concerns the district court's decision to split the five counts among three groups according to each primary victim. While we ultimately conclude that dividing the counts into three groups was correct, we are not persuaded that grouping by victim fits within the guidelines' rationale. Contrary to its position below, the government similarly now contends that grouping by victim, when doing so results in splitting counts as it does here, is a mistaken interpretation of the guidelines. The government nevertheless urges that we affirm the judgment below on the theory that application of the proper alternative grouping method will result in the same number of groups (three) and the same combined sentencing range (twenty-seven to thirty-three months). Reviewing the district court's legal interpretation of the guidelines de novo, *see United States v. Nicholas,* 133 F.3d 133, 134 (1st Cir.1998), we agree with the government that any methodological error by the district court was harmless.

■ The grouping rules come into play only with respect to multi-count indictments. *See* U.S.S.G. § 3D ("Multiple Counts"). They are not written so as to apply to a single count indictment. Nor, even in the case of multi-count indictments, would it be consistent to split single counts therein among several groups. The same prohibition against grouping within a single count indictment would apply to multiple grouping within any given single count of a multi-count indictment. Supporting this view is the fact that where the guidelines wish to split a single count among two or more groups according to individual victims, they give specific directions on the matter. *See, e.g.,* U.S.S.G. § 2N1.1(d)(1) ("Tampering or Attempting to Tamper Involving Risk of Death or Bodily Injury") ("If the defendant is convicted of a single count involving (A) the death or permanent, life-threatening, or serious bodily injury of more than one victim, or (B) conduct tantamount to the attempted murder of more than one victim, Chapter Three, Part D (Multiple Counts) shall be applied as if the defendant has been convicted of a separate count for each such victim."); U.S.S.G. § 2G1.1(d)(1) ("Promoting Prostitution or Prohibited Sexual Conduct") ("If the offense involved more than one victim, Chapter Three, Part D (Multiple Counts) shall be applied as if the promoting of prostitution or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction."); U.S.S.G. § 2G2.1(c)(1) ("Sexual Exploitation of a Minor") ("If the offense involved the exploitation of more than one minor, Chapter Three, Part D (Multiple Counts) shall be applied as if the exploitation of each minor had been contained in a separate count of conviction."). Moreover, were a district court permitted without special guideline instruction to split a single count among two or more groups, several purposes of the grouping rules might arguably be jeopardized, *e.g.,* to provide only "incremental punishment for significant additional criminal conduct" and "to prevent multiple pun-

ishment for substantially identical offense conduct," *see* U.S.S.G. § 3D, introductory cmt.

■ But while, as said, splitting individual counts by victim is therefore problematic, bundling counts according to those that contain the exact same primary victims—the approach now urged by the government—seems appropriate in circumstances like the present.

■ In taking this approach, we note the following breakdown of the counts of the indictment by number, date of threat and victim.

| Count | Date | Victim |
|-------|------|--------|
| I | 10/14/99 | Richard |
| II | 11/30/99 | Richard, Andrea, Chantelle |
| III | 12/4/99 | Richard, Chantelle |
| IV | 12/6/99 | Richard, Andrea, Chantelle |
| VI | 10/18/99 | Richard, Chantelle |

Looking at this breakdown, we observe that the guideline commentary relevant to the crimes at issue instruct that "multiple counts involving different victims are not to be grouped." U.S.S.G. § 2A6.1, cmt. n. 2. This commentary strongly suggests that counts with different primary victims, such as Counts I and II (Count II names Andrea and Chantelle and Count I does not), should not be grouped together. The fact that Counts I and II share a common primary victim, Richard, does not alter this effect of the commentary's prohibition. We also observe that the grouping rules themselves instruct a district court to group counts "involving substantially the same harm", harm being defined as "the same victim and the same act or transac-

tion" or "the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2(a), (b).

■ In light of these considerations, a group would form of Counts II and IV, as they both contain all three Carpenters as primary victims and both consist of identical acts committed on different days, that is, threatening behavior toward the same victims over the phone. *See* U.S.S.G. § 3D1.2(b). Similarly, a group would form of Counts III and VI, as they both contain Richard and Chantelle as primary victims and both consist of acts connected by the common objective of harassment and stalking. *See id.*[7] This leaves Count I as a single count in its own group, being the only count naming Richard Carpenter alone as a primary victim. We find the above to be the appropriate grouping methodology here.

Defendant complains that this grouping analysis has the potential of punishing worse conduct less severely and thus for reasons of common sense cannot be the correct grouping scenario. For example, defendant points out that, under this analysis, a defendant who threatens Person A on Day 1 and Person B on Day 2 ("scenario one") will be sentenced based on the calculation for two groups, whereas a defendant who threatens Persons A, B and C on Day 1, Persons A, B and C on Day 2, and Persons A, B and C on Day 3 ("scenario two") will be sentenced based on the calculation for only one group (assuming that all three persons are primary victims) and will therefore receive a lesser sentence

---

7. It is also possible to group these same Counts III and VI under § 3D1.2(c)("When one of the counts embodies conduct that is treated as a specific offense characteristic in, or another adjustment to, the guideline applicable to another of the counts"), as Count III would be a specific offense characteristic for sentencing based on Count VI. *See* U.S.S.G. § 2A6.2 (directing that the base offense level be raised by two if the offense involved, *inter alia*, "stalking, threatening, harassing or assaulting the same victim").

than the defendant in scenario one. Defendant argues that the scenario two is worse, however—threatening three people three times—and should result in a higher sentence than scenario one—threatening only a total of two people, each on one day only.

While there is some force to this argument, it is flawed in several respects. First, we decide questions presented to us based primarily on the factual circumstances of the particular case. While answering hypotheticals may provide useful insight into the overall cogency of a particular rationale, we need not and cannot resolve satisfactorily every imaginable hypothetical before reaching a result in the case at hand. Second, in future cases, other factors not now before us may point the way to a just and perhaps diverging result. For example, were a defendant to threaten the same three people on three different days, his sentence, although based on only one grouping, could be lengthened (via a higher base offense level) to account for the repeated instances of the same offense, *see* U.S.S.G. § 2A6.1(b)(2) ("If the offense involved more than two threats, increase by 2 levels."), or the repeated instances against the same victim, *see* U.S.S.G. § 2A6.2(b)(1)(C) ("If the offense involved . . . a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim, increase by 2 levels."). It is not necessarily the case, therefore, that defendant's hypothetical scenario two would not be subject to the same or greater punishment than scenario one. Lastly, we note that a multi-group indictment, such as that posed by defendant's scenario one, does not inevitably lead to a higher punishment than that mandated by a single-group indictment. For example, in a two-group indictment, if one group has an offense level nine levels below the other group, that lower-level group is not fac-

tored into the sentencing calculation at all. *See* U.S.S.G. § 3D1.4(c).

We recognize that the grouping analysis proposed by the government requires us to read into the grouping rules the possibility that the word "victim" in subsections (a) and (b) of § 3D1.2 could also represent its plural "victims". But this interpretation seems entirely reasonable under relevant guideline policy considerations.

We must recognize, also, that the drafters of the guideline rules may not themselves have provided for every contingency. Here the drafters may not have focused fully on a situation involving multiple primary victims listed in a single count that forms but one of several in an indictment describing an on-going campaign of harassment and threatening violence. *See United States v. Adelman*, 168 F.3d 84, 87 (2d Cir.1999) ("The Guidelines do not provide for consideration of harm to multiple victims of threatening communications."). Courts must do the best they can within the less than perfect legal landscape.

█ Finally, we note that had the charging document been more fully itemized and differentiated, structured by individual victim and date and charging nine instances of interstate threats instead of four, under the government's proposed grouping method, the district court could have appropriately still found only three groups. This confirms that although grouping by victim when that method results in splitting counts may not be contemplated by the guidelines, grouping multiple counts when they contain the exact same primary victim or victims and "the same act or transaction," U.S.S.G. § 3D1.2(a), or "two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan," U.S.S.G. § 3D1.2(b), is

prescribed by the language and purpose of the grouping rules.

Had the district court applied the analysis we now endorse to the facts of this case, it would have reached the following conclusion based on its finding of three primary victims: (1) the indictment is properly divided into three groups, here being Count I, Counts II/IV, and Counts III/VI; (2) the group with the highest offense level (18) controls, that being the group naming both Richard and Chantelle victims, Counts III/VI, *see* U.S.S.G. § 3D1.4; (3) this results in a combined offense level of 21, *see* U.S.S.G. § 3D1.4(a); and (4) with a three-level reduction for acceptance of responsibility, the total offense level becomes 18, which, at a criminal history category I, corresponds to a sentencing range of twenty-seven to thirty-three months. This is the same range as that reached by the district court under the application of the guidelines it adopted. The error was therefore harmless and the judgment below is ***affirmed***.